# JAMES MICHAEL GRIMM *v.* STATE OF MARYLAND

[No. 176, September Term, 1968.]

*Decided March 17, 1969.*

*Robert Gordon King* and *Louis Peregoff* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Edward A. De-Waters, Jr.,* and *Robert A. DiCicco, Assistant State's Attorneys for Baltimore County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

On September 1, 1967 at approximately 4:55 a.m. Francis McCoy, a driver for the New Eastern Cab Company, was found robbed and murdered near his cab in the Middlesex homes area in Baltimore County. At 5:25 a.m. that same morning Officer John Breneman went to appellant's trailer at 55 Cool Breeze

Trailer Camp and arrested him and Jerry Cooper, his companion, for the crimes.

On May 13, 1968, appellant was convicted by the court sitting without a jury of robbing McCoy with a deadly weapon, of the first degree murder of McCoy, and of carrying a deadly weapon openly with intent to injure McCoy. He was sentenced to a life term under the jurisdiction of the Department of Correction. His principal contention on this appeal is that several guns and some shells taken from his trailer approximately twelve hours after he had been illegally arrested were improperly received in evidence against him at the trial because the search warrant pursuant to which they were seized was constitutionally defective for failure to show probable cause for its issuance.

I

Officer Breneman, the affiant for the search warrant, recited in his application that there was probable cause to believe that "the instrumentalities used in the commission of an armed robbery and homicide, * * * thought to be a certain pistol or pistols" were located within appellant's trailer home. In support of this conclusion, Breneman recited in the application that at 2:30 a.m. on September 1, Officer William Myers had investigated a prowler call, during which he encountered two white males who identified themselves by name as the appellant and Jerry Cooper, the appellant giving his address as 55 Cool Breeze Drive, and telling Myers that he was on his way home at that time; that appellant was observed by Myers to be 5'10" tall and Cooper about 5'9", and wearing a black suit and blue shirt; and that after Myers satisfied himself that these men were not the suspected prowlers, he drove them to a phone booth where they made a phone call at 2:45 a.m., shortly after which a New Eastern cab arrived and picked them up.

Breneman further recited in his affidavit that at 3:00 a.m. that same morning he observed at a distance two white males emerge from Cedar Drive (near the Cool Breeze Trailer Park) and enter a sheltered bus station; that ten minutes later a New Eastern cab stopped and they got in, but immediately thereafter got out and returned to the waiting station; that ten minutes later a second New Eastern cab came by and picked up the

two men; and that one of the white men was 5'10" to 5'11" and was wearing dark clothing, and the other white male was also 5'10" to 5'11".

Breneman then stated in his application that at 4:00 a.m. a call was made to all police cars to "locate a New Eastern cab last known to be going to 840 Arncliff Road"; that thereafter Officer J. Zulauf, assigned to the Essex Station, observed New Eastern cab #1348 parked near the Baltimore County pumping station and also saw a body lying near the cab, bleeding from the head; that upon investigation, Zulauf observed a wallet on the ground next to the body and noticed that the individual's rear pocket had been ripped off; and that at 4:55 a.m. Zulauf radioed that he had located the missing cab and "also a man who had been badly beaten." Officer Myers, who overheard Zulauf's call, radioed Zulauf that he had seen two white males, whom he named as appellant and Cooper, enter a New Eastern cab.

Breneman further recited in his application for the search warrant that he knew both appellant and Cooper and knew that appellant lived at 55 Cool Breeze Trailer Park; that he then proceeded to appellant's trailer and was admitted to the premises by appellant's father; and that he arrested appellant and Cooper, who were then in bed, for the robbery and murder of the cab driver.

The affidavit further specified that at 8:55 a.m. Officers Myers and Neuner interviewed Johnie Milom, another nighttime New Eastern cab driver and were told by him that at 2:50 a.m. he picked up two men and took them to the Cool Breeze Trailer Park at Martin Boulevard and Cedar Drive; that at 3:05 a.m. he observed the same two men standing at the Cool Breeze Trailer Park and that they hailed his cab and asked to be taken to 840 Arncliff Road; that because he had another call, he called McCoy's cab over his radio and asked McCoy to pick them up; that McCoy acknowledged that he would pick them up and that at 3:15 a.m. he (Milom) was advised by his dispatcher that McCoy "was in route to Arncliff"; and that he then requested the dispatcher to call McCoy to deliver a message for him but the dispatcher thereafter could get no response from McCoy's cab.

The search warrant application also stated that Luther Ha-

warth, owner of the New Eastern Cab Company, related that McCoy's taxicab manifest showed that he had collected $22.60 during the course of the evening, and that Detective Sergeant Roemer had examined decedent's wallet and person at the scene of the crime and found that neither contained any money. Breneman further stated in the application that the Baltimore City morgue report indicated that McCoy had been shot numerous times, and that two .38 caliber slugs and one .22 caliber slug had been recovered from his body.

The search warrant was obtained between 2:00 p.m. and 3:00 p.m. on September 1 and was executed at approximately 4:40 p.m. the same day. As a result of the search of appellant's trailer, a .22 caliber sawed off rifle and a .38 caliber revolver and five spent shells were found and were introduced in evidence, together with expert testimony that these were the murder weapons.

It is well settled that the presence or absence of probable cause to support a search warrant must be determined solely from the allegations of the application for the warrant. *Aguilar v. Texas,* 378 U. S. 108; *Tucker v. State,* 244 Md. 488; *Hall v. State,* 5 Md. App. 394. It is equally well settled that probable cause, which is less than certainty or demonstration but more than suspicion or possibility, is to be determined by the judge who issues the warrant, and if a prudent and cautious man would be justified from the facts presented to show its existence in believing that the offense had been or was being committed, the warrant properly may be issued. *Henson v. State,* 236 Md. 518; *Salmon v. State,* 2 Md. App. 513. It is thus clear that evidence which is sufficient for conviction is not required for the issuance of a search warrant. *Frantom v. State,* 195 Md. 163; *Propst v. State,* 5 Md. App. 36. In other words "only the probability, and not a prima facie showing of criminal activity is the standard of probable cause." *Spinelli v. United States,* 391 U. S. 933.

It is also settled beyond question that an affidavit for a search warrant may be based on hearsay information and need not reflect the direct personal observations of the affiant, so long as the magistrate is informed of some of the underlying circumstances supporting the affiant's conclusion. *United States v.*

*Ventresca*, 380 U. S. 102; *Aguilar v. Texas, supra; Sessoms v. State*, 3 Md. App. 293; *Frey v. State*, 3 Md. App. 38; *Scott v. State*, 1 Md. App. 481. More particularly, where the affidavit is based on hearsay, it must set out some of the underlying circumstances from which the affiant could reasonably conclude that the hearsay information was reliable and that the items sought to be seized were within the place to be searched. See *Rugendorf v. United States*, 376 U. S. 528; *Scott v. State*, 4 Md. App. 482; *Kist v. State*, 4 Md. App. 282. It has been held that probable cause exists where a "substantial basis" is shown for the magistrate to conclude that the items to be seized are "probably" within the place to be searched. *Aguilar v. Texas, supra; Rugendorf v. United States, supra; Jones v. United States*, 362 U. S. 257.

Within this constitutional framework, affidavits of probable cause are to be tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray v. Illinois*, 386 U. S. 300; in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States v. Ventresca, supra;* the determination of a magistrate that probable cause exists should be paid great deference by reviewing courts, *Jones v. United States, supra;* and when determining whether an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants, *United States v. Ventresca, supra.*

Considering the allegations of Officer Breneman's application for the warrant in light of these principles, we think that probable cause for the issuance of the search warrant was properly shown. The affiant, a member of the investigating police team, recited in his affidavit that he had information from a police officer (Myers) that appellant and Cooper had entered a New Eastern cab at approximately 2 :45 a.m., bound for appellant's home at the Cool Breeze Trailer Park. The affidavit further recited that Milom, the cab driver who drove them there, saw them again at 3 :05 a.m. near the trailer park, at which time they asked him to drive them to Arncliff Road; and that it was these same two men who Milom requested McCoy to pick up.

Breneman's affidavit stated that the cab dispatcher radioed that McCoy, in fact, had picked up the two men, that he was in route to Arncliff Road, immediately following which contact was lost with McCoy's cab. The affiant's own personal observations were, in part, corroborative of those made by both Myers and Milom. The allegations in the application clearly established that the victim had been robbed and shot by .22 and .38 caliber projectiles. That the affiant's sources of information were reliable is too plain to require discussion, and we think there was a "substantial basis" set forth in the application to support the affiant's conclusion that the guns used in the crime could be found in appellant's trailer home—it being altogether reasonable to believe that the guns had been carried away from the scene of the crime by the perpetrators and, having thereafter gone to appellant's trailer, had taken them there.[1]

As the search warrant was valid, and as the search was conducted and the guns and shells seized pursuant to its authority, it is not material whether appellant's arrest at the trailer park by Officer Breneman was itself lawful since, according to the testimony adduced at the trial—testimony which the trial judge stated he believed—the police did not search the trailer at the time of the arrest but only after they obtained the search warrant.[2] In other words, since the evidence in question was not

1. The application for the warrant also stated that when Officer Myers encountered appellant at 2:45 a.m. he observed that he only had $1.00 in his wallet, but that after appellant and Cooper were arrested, they were searched at the police station, and each had a sum of money generally corresponding in amount to that which could have been taken from McCoy during the crime. If the appellant's warrantless arrest at the trailer was unlawful, then the subsequent search at the police station was also unlawful, so that the results of that search could in no event be used as a basis upon which to establish probable cause for the issuance of the warrant to search appellant's trailer. But even if the arrest was unlawful—considering the application for the warrant as a whole— we do not think that the mere inclusion therein of the fact that the police station search of the appellant revealed that he had money in his possession would of itself fatally taint the application.

2. Appellant's accomplice Cooper testified that the police did search the trailer at the time that he and appellant were first arrested.

obtained as a result of an unlawful search or seizure, it could in no event be rendered inadmissible even if it was shown that the original arrest was itself illegal. See *Jones v. State,* 5 Md. App. 489; *Jones v. State,* 5 Md. App. 180.

Appellant further contends that the search warrant was constitutionally invalid because the police, in making the arrest, were unlawfully within his trailer, and that such unlawful intrusion continued for some twelve hours thereafter, up to and including the time that the warrant was actually obtained and executed. He further contends that the warrant was invalid for failure to serve a copy on him and because there was no consent given to make the search.

We find nothing of substance in any of these allegations. Having a valid search warrant in their possession, no consent to search was necessary and there was no illegal breaking involved in the execution of the warrant. See *Henson v. State, supra.* The police served a copy of the warrant on appellant's father, who owned the trailer, and they were not obliged to serve a copy on appellant (who was then in jail) prior to executing it. And the fact that the police posted a guard within the trailer pending obtention of the search warrant does not vitiate the warrant, the evidence showing that the police were invited to remain inside by appellant's father, and that they did not search the trailer prior to obtaining the warrant.

## II

Appellant next contends that the lower court erred in denying his pretrial motion "to suppress evidence and exclude the co-defendant, Jerry Cooper, as a prosecuting witness for the State and for suppression of his testimony." The motion was based on the asserted fact that Cooper had been permitted to plead guilty to murder in the second degree on February 13, 1968 and was sentenced to twenty-five years imprisonment, with the implied promise made by the trial judge in Cooper's case that, depending upon his testimony at appellant's trial, the court might reduce his sentence.

The record discloses that Cooper testified as a State's witness that appellant robbed and murdered McCoy and that he,

Cooper, did not participate in the crime, although he admitted sharing in the profits of the robbery.[3]

On these facts, appellant contends that Cooper's testimony was tainted, and that it was "nothing more or less than an open invitation to perjury," and, as such, "is so offensive to the basic common and fundamental ideas of a fair trial as to have denied to the appellant due process and the equal protection of the law under the Fourteenth Amendment."

It is clear from the record that the trial judge was fully informed as to the background against which Cooper was testifying.[4] At the conclusion of Cooper's testimony, the trial judge stated that he viewed such testimony "with a great deal of care," that it had to be "carefully weighed because, the description of such testimony as being tainted is not far off the mark." In colloquy with counsel, the trial judge made clear his belief that Cooper was equally guilty of the crime with appellant and did not believe his testimony that he did not participate in the robbery and murder of McCoy. It is thus apparent that the trial judge was acutely aware of the circumstances under which Cooper testified as a State's witness against appellant, and we are satisfied on the record before us that the admission of Cooper's testimony did not constitute reversible error.

### III

Nor do we find any merit in appellant's contention that the disparity between his sentence and that of Cooper deprived him of the equal protection of the law under the Fourteenth Amendment to the Federal Constitution. He urges that since the trial judge in his case stated that Cooper was equally guilty with him of first degree murder, and since the trial judge in Cooper's case accepted a guilty plea to second degree murder, and imposed only a fifteen-year sentence, then he (appellant) could not be convicted of greater than second degree murder or sentenced to more than fifteen years imprisonment.

---

**3.** After appellant was convicted, Cooper's sentence was reduced from twenty-five to fifteen years.

**4.** Cooper testified that he had no recollection of the trial judge telling him that clemency might be extended to him, depending upon his testimony at appellant's trial.

Virtually the same contention was recently raised and rejected in *Boone v. State,* 3 Md. App. 11, at pages 30-31, and we, therefore, see no need for extended discussion. We note, however, that the fact that a codefendant receives a lesser sentence does not *per se* render unlawful an otherwise permissible sentence. *James v. State,* 242 Md. 424; *Miller v. State,* 1 Md. App. 653.

## IV

Finally, appellant contends that the trial court erred in denying his motion for the production of the Grand Jury testimony of Sergeant Louis Roemer. The contention appears based on the proposition that Roemer's testimony at trial revealed that he was the only witness who testified before the Grand Jury and that his testimony was insufficient to justify the indictment. Appellant claims that he was therefore seriously prejudiced by his inability to impeach Roemer at the trial through use of his testimony before the Grand Jury.

It is the well settled rule that the competency of testimony before the Grand Jury will not be inquired into by the courts and the alleged insufficiency of such evidence is no ground to dismiss an indictment. *Costello v. United States,* 350 U. S. 359; *Pick v. State,* 143 Md. 192; *Wilson v. State,* 4 Md. App. 192. Equally well settled is the proposition that there is no absolute right to inspect the testimony of a witness before a Grand Jury. *Dennis v. United States,* 384 U. S. 855; *Pittsburgh Plate Glass Company v. United States,* 360 U. S. 395. At the very most, *Dennis* makes clear that it is only upon a showing of a "particularized need" that an accused might be entitled in a proper case to such disclosure. See *Wilson v. State, supra* (Footnote 10), and *Chesley v. State,* 3 Md. App. 588 (Footnote 7). We think the trial judge was entirely correct when, in denying appellant's motion, he said:

"* * * there is no showing in this case of any particularized need nor anything about this case that would bring it within the exception. If this defendant is entitled to a transcript of the Grand Jury proceedings then I cannot think of any criminal cases, be it felony or misdemeanor, where a defendant could not obtain

the Grand Jury testimony, and that is not the law of Maryland."

*Judgments affirmed.*